**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert HANEY, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Julie Alice GENTRY, Defendant–Appellant.**

Nos. 89–5637, 89–5638.

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1990.

Decided Sept. 24, 1990.

As Amended Oct. 25, 1990.

Jack W. Stewart, Jr., Stephen Paul Lindsay, Moore, Lindsay & True, Asheville, N.C., for defendants-appellants.

Vicki S. Marani, U.S. Dept. of Justice, Washington, D.C., argued (Thomas J. Ashcraft, U.S. Atty., Jerry W. Miller, Asst. U.S. Atty., Asheville, N.C., on brief for plaintiff-appellee.

Before RUSSELL and WILKINSON, Circuit Judges, and BULLOCK, United States District Judge for the Middle District of North Carolina, sitting by designation.

DONALD RUSSELL, Circuit Judge:

In their joint criminal trial, Robert Haney was convicted of participating in two bank robberies, and Julie Alice Gentry was convicted of participating in one of those two robberies. Both Haney and Gentry appeal, claiming that the trial court was clearly erroneous in admitting evidence regarding their previous bank robbery convictions in Georgia. In addition, Gentry appeals, claiming that her indictment was improperly joined with Haney's for trial and that their trials should have been severed. Finding no error, we affirm.

I.

The two bank robberies at issue occurred in Asheville, North Carolina. The First Citizens Bank and Trust Company was the first bank to be robbed, on February 11, 1988. The participants included appellants Gentry and Haney, along with Michael Neville and Jack Messer. These participants had come together by a series of friendships. Gentry and Haney were lovers, and Neville and Haney had met while in prison

together in Alabama. Following Neville's release from prison, Neville located Haney living in Asheville, and Haney introduced Neville to Messer. Soon thereafter, Haney, Neville, and Messer decided to rob a bank. They further decided that Neville would commit the actual robbery, since Haney and Messer were well known in the Asheville area.

The three first conducted a significant amount of planning. Haney and Messer worked on establishing alibis. They next used Haney's wife's car (apparently, Haney had a wife *and* a girlfriend), a white 1965 Chevy, to scout the area for a good bank to rob. They eventually selected the bank that was to be robbed, and they planned to steal a car from a local high school to use for the getaway. Haney also gave a pistol to Neville for use in the robbery, and he taught Neville how to use the gun, since Neville had never handled a pistol before.

On the day of the robbery, Haney went to work in order to establish an alibi. Neville and Messer drove the white Chevy to the high school, where Neville stole a Ford Mustang by hot-wiring it. Messer then drove to a grocery store parking lot where he would meet Neville after the robbery. Messer carried a police scanner to detect any trouble.

Neville drove the stolen Mustang to the First Citizens Bank and conducted the robbery. He pointed a gun at the tellers, demanded money, threatened to kill them, and warned them against giving him bait money or dye packs. The tellers gave Neville approximately $10,000, and Neville fled. Neville drove to meet Messer in the grocery store parking lot, ditched the Mustang, and drove off with Messer in the white Chevy to Messer's house, where Neville was living temporarily. Messer dropped off Neville at his home and left, presumably to return to work in order to maintain his alibi. At the home, Neville counted the money, and Gentry and Messer's wife put the loot in a hidden place.

When Messer returned home that evening, he and Neville and Haney split the proceeds. Neville received approximately $5000 and Haney and Messer split the rest.

Neville then used part of his proceeds to buy illegal drugs from Haney and Messer. Neville also returned Haney's gun and scanner to him. Gentry then hid Neville in her trailer until things died down. In that trailer, Haney and Neville planned the next robbery.

The second bank robbery (a branch of the First Union National Bank) occurred on February 24, 1988. Before the robbery, Haney and Gentry searched the area for potential targets that would afford an easy escape back to Gentry's trailer. Apparently Neville was not brought on the search because of his exposure in the first robbery. After locating several possibilities, Haney and Gentry returned to discuss the operation with Neville. They decided that Neville would rob the bank, Gentry would drive the getaway car, and Haney would go to work in order to establish an alibi. Messer's car would be used for transportation.

The morning of the robbery, Gentry drove Neville to see the banks under consideration. After some discussion, the two settled on the bank that was eventually robbed, and they also picked a parking area in which to meet after the robbery. After completing their plans, they drove back to Messer's house, took Messer's car, and executed the robbery. Meanwhile Messer and his wife stayed in a bar throughout that portion of the day in order to establish an alibi. Neville entered the bank as planned and announced the robbery to a teller. As before, he brandished a pistol, stated that he had a police scanner, and instructed the teller not to push any buttons to alert the police. He received over $16,000 and fled.

While Neville was robbing the bank, Gentry waited in the getaway car. She wore a big hat and sunglasses, presumably to hide her identity. Gentry's cousin, Teresa Alexander, noticed Gentry waiting in the car, "scrunched" behind the steering wheel. When Alexander told Gentry several days later that she had seen Gentry there, Gentry replied that Alexander had been "at the wrong place at the wrong time."

After Neville completed the robbery, he met Gentry at the getaway car and the two

drove to Gentry's trailer. Gentry then dropped Neville off, drove to Messer's house to leave Messer's car and retrieve her own, and returned to the trailer. Later that day, Haney, Gentry and Neville met in Gentry's trailer to divide the loot. Haney received $5000 and Neville $10,000. With two bank robberies behind them, it was time to get Neville out of the area.

That night, Gentry and Messer's wife drove Neville to Knoxville, Tennessee, in the white Chevy owned by Haney's wife. Before the trip, Gentry dyed Neville's hair to disguise his appearance. In addition, Haney and Messer gave Neville a fake North Carolina driver's license that they had made on a photo identification machine in their possession. All of the parties were later arrested, which eventually led to Neville's guilty plea and the convictions of Messer, Haney and Gentry.

Although Neville was now gone, this did not end Haney's and Gentry's partnership in crime. They subsequently robbed a bank in Georgia by the same methods and were convicted for that robbery before they were tried for the two Asheville robberies. On May 24, 1988, Gentry and Haney robbed the Decatur Federal Savings & Loan in Dalton, Georgia. Gentry performed the actual stick-up. She entered the bank, again wearing sun glasses, and approached a teller. She showed a gun, demanded money, and warned against the use of dye packs. After the robbery, Gentry drove away alone.

Later that day, Gentry and Haney were apprehended while still in Georgia. A loaded gun was recovered from Gentry's waistband, the stolen money was found in her purse, and a police scanner was found in the back seat of the car. Haney was carrying fake identification, which was made in the same manner and by the same machine that was used to manufacture Neville's false identification.

Before the proceedings below, Gentry was prosecuted for the Dalton robbery and incarcerated in Georgia. During that time, she corresponded with Neville, who was in prison in Texas on bank robbery charges. This correspondence was intercepted, and it buttressed Gentry's affinity for bank robbery and Neville (at this point, Gentry was apparently romantically inclined toward both Neville and Haney). In those letters, Gentry brags about what a good robbery team she and Neville had formed, and she encouraged Neville to look forward to teaming up again in the future. She also wrote another letter to a person identified at trial as someone other than Neville,* which apparently threatened violence against a witness in the case at bar. Apparently, Gentry felt that someone had double-crossed both her and the recipient of the letter and that this person should be killed for doing so.

Eventually, Gentry, Haney, Neville and Messer were all rounded up and charged with the Asheville robberies. All except Gentry were indicted for the first robbery, and all four were indicted for the second robbery. Neville pled guilty to both indictments and agreed to testify for the government. Messer's trial on both indictments was severed from the others', and he was tried separately before the appellants' trial. Messer was convicted for the first robbery, but not for the second. Gentry and Haney were tried together, and each was convicted on all charges. Haney was convicted of aiding and abetting both robberies and of carrying a firearm in the process, and received a sentence of 322 months' imprisonment, to run concurrently with the Georgia sentence. Gentry was convicted of aiding and abetting the second robbery and of the same firearm charge, and she received a prison term of 111 months, also running concurrent with her Georgia sentence. Both Gentry and Haney were also sentenced to five years' probation following their release. This appeal ensued.

### I.

Appellant Gentry argues that her indictment in the second robbery should not have

---

* Although it has no bearing on our disposition, apparently the recipient of the letter was not identified in order to try Haney and Gentry together. Perhaps the introduction of this letter would have caused Haney and Gentry to pose inconsistent defenses.

been joined for trial with the two indictments of Haney regarding his participation in both Asheville robberies. She also argues that once the indictments were joined, they should have been severed for trial due to the alleged prejudice to her case caused by the joinder. The government responds that joinder was proper because Haney and Gentry could have been included in a single indictment and because both robberies were a part of the same series of transactions. The government further argues that the district judge was not clearly erroneous in deciding not to sever their trials. We find that the indictments were properly consolidated as an initial matter, and that the district court did not abuse its discretion in denying severance.

The joinder occurred pursuant to Federal Rules of Criminal Procedure 8(b) and 13. Rule 8(b) addresses indicting more than one person in the same indictment. It includes several persons in one indictment where the defendants "have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). This rule permits dividing an indictment into several counts, and each defendant need not be charged in each count. Rule 13 permits trying defendants together who were indicted separately when they could have been indicted together. In this instance, Haney and Gentry were indicted separately, and their indictments were consolidated for trial under Rule 13. Yet, in order to determine if separately indicted defendants could be tried together (per Rule 13), we must look to the test articulated in Rule 8(b)—whether the two robberies were part of the same transaction or series of transactions.

■ We have previously defined the level of relatedness required to satisfy Rule 8(b)'s requirements. "Separate acts constituting separate offenses are sufficiently related to be within the same series if they arise out of a common plan or scheme." *United States v. Porter*, 821 F.2d 968, 972 (4th Cir.), *cert. denied*, 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1987). "There must be a series of acts unified by some

substantial identity of facts or participants." *Id.* "We have defined 'transaction' flexibly, as 'implying a connection or logical relationship rather than immediateness.'" *United States v. LaRouche*, 896 F.2d 815, 830 n. 5 (4th Cir.1990), *quoting United States v. Carmichael*, 685 F.2d 903, 910 (4th Cir.1982).

■ There is no doubt that these two bank robberies, and the participants, were sufficiently related. First, the two robberies were substantially similar. In each, the participants would first go on an exploratory mission to locate a target. Next, alibis were arranged for certain members of the scheme and a location was selected for the actual robber to meet the getaway car. The robber carried a pistol, threatened the life of the teller, and warned against the use of means to alert the police. A police scanner was used to watch out for police detection. The robber (Neville both times) was immediately hidden after the robbery, and the loot was divided that evening once all of the involved parties had assembled. There was also a commonality of participants. Haney, Neville and Gentry each had a role in both robberies. Most importantly for this analysis, Gentry provided Neville a hideout after the first robbery. From what the record reveals, she could have been charged as an accessory after the fact. Thus, due to the related nature of the two robberies, the use of substantially the same players in both robberies, and Gentry's limited role in aiding the first robbery, joinder was proper.

■ As for Gentry's Rule 14 argument, we note that the decision to sever a trial lies within the discretion of the trial court and it will not be overturned absent a clear abuse of discretion. *United States v. Ricks*, 882 F.2d 885, 894 (4th Cir.1989). Gentry has not made a strong argument regarding any possible prejudice. She has correctly noted that severance usually is not granted when there was a criminal conspiracy among the defendants. However, this does not mean that severance is required or even preferred when no conspiracy has been charged. Rule 14 requires a showing of prejudice, and Gentry

has made none. We have held that the mere existence of antagonistic defenses is insufficient standing alone to require severance. *Ricks*, 882 F.2d at 894. Yet, Gentry's and Haney's defenses were not even antagonistic. Gentry's defense to the second robbery was the same as Haney's defense to both robberies—that Neville was lying about Gentry's and Haney's involvement in order to curry favor with the prosecution and obtain a lighter sentence.

In addition, the jury was warned repeatedly to judge Gentry's guilt in the second robbery simply based upon that evidence, and proof of Haney's involvement in the first robbery had no bearing on Gentry's guilt or innocence. The jury was so instructed after the evidence of the first robbery was presented, at the end of the case, and in the court's final charge to the jury. In addition, the prosecutor repeated this requirement in his closing argument. Accordingly, we find that the district judge did not abuse his discretion in denying a severance.

## II.

■ Both Gentry and Haney also appeal the admission of evidence regarding their arrest and conviction for the Georgia robbery of the Decatur Federal Savings & Loan. The appellants contend that the probative value of this evidence was outweighed by its prejudicial effect. The government responds that the evidence was more probative than prejudicial and that the trial judge was within his discretion in admitting it.

The relevancy of this evidence was based upon Federal Rule of Evidence 404(b). That rule prohibits the admission of evidence of "other crimes" solely for the purpose of establishing the defendant's bad character. Yet, such evidence may be admitted for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). Of course, even if relevant under Rule 404(b), a defendant may challenge the evidence as more prejudicial than probative under Federal Rule of Evidence 403. *Unit-*

*ed States v. Rawle*, 845 F.2d 1244, 1247 (4th Cir.1988). The district judge's decision to admit evidence under Rule 404(b) will not be overturned on appeal unless it was "arbitrary or irrational."

We find that the district judge's ruling to admit this evidence was not "arbitrary or irrational." This evidence showed a common plan to commit bank robberies. Furthermore, in each case a pistol was used, the robber warned against the use of dye packs, a getaway car was used, and a police scanner was used to detect trouble. Thus, the evidence of the Georgia robbery was quite relevant since it was evidence of a signature crime. Nor was it more prejudicial than probative. True, it was prejudicial to the defendants in the sense that it bolstered the prosecution's case, but under that definition, all incriminating evidence is prejudicial. The primary impact of the evidence was to demonstrate a string of robberies committed in the same manner and that type of evidence was certainly proper.

The jury was also warned repeatedly that evidence of the Georgia robbery was not direct proof of the commission of the two Asheville robberies by the defendants. Instead, the judge warned the jury that this evidence was only relevant to show that the crimes "were committed in a distinctive way so as to show a signature or pattern ... or plan." The judge repeated this instruction in his final charge to the jury, and counsel for both sides reminded the jury of the limited role that this evidence could play in their deliberations. Thus, we do not find that the district judge's decision to admit this evidence was "arbitrary or irrational."

Accordingly, the convictions of the defendants are

AFFIRMED.